786 F.Supp. 21 (1992)
MARINE TRANSPORTATION SERVICES SEA-BARGE GROUP, INC., Plaintiff,
v.
James BUSEY, Acting Secretary, U.S. Department of Transportation, United States Department of Transportation, William A. Creelman, Deputy Maritime Administrator, United States Maritime Administration, Defendants.
PUERTO RICO MARITIME SHIPPING AUTHORITY, Plaintiff,
v.
James BUSEY, Acting Secretary, U.S. Department of Transportation, United States Department of Transportation, William A. Creelman, Deputy Maritime Administrator, United States Maritime Administration, Defendants.
SEA-LAND SERVICE, INC., Plaintiff,
v.
James BUSEY, Acting Secretary, U.S. Department of Transportation, United States Department of Transportation, William A. Creelman, Deputy Maritime Administrator, United States Maritime Administration, Defendants.
Civ. A. Nos. 89-2278(RCL), 90-0969(RCL), and 90-0980(RCL).
United States District Court, District of Columbia.
January 31, 1992.
*22 *23 John M. Nannes, Skadden, Arps, Slate, Meagaher & Flom, Washington, D.C., for Sea-Land Services, Inc.
Edward Schmeltzer, Schmeltzer, Aptaker & Sheppard, Washington, D.C., for Marine Transportation Servs.
Amy Loeserman Klien, Klien & Baglleo, Washington, D.C., for PRMSA.
Jeffrey T. Sprung, Asst. U.S. Atty., Washington, D.C., for defendant.

MEMORANDUM OPINION
LAMBERTH, District Judge.
These cases come before the court on several motions and cross motions for summary judgment and the oppositions and replies thereto concerning the proper interpretation of Section 506 of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1156 (1975 and Supp.1991) ("Section 506"). On January 31, 1990, and as amended on February 28, 1990, the United States Maritime Administration ("MarAd") issued a Final Statutory Interpretation of the disputed provision in Section 506. Numerous parties are involved in the present litigation: plaintiff in the first case, Civil Action No. 89-2278, Marine Transportation Services Sea-Barge Group, Inc. ("Sea-Barge"), defendants James Busey, Acting Secretary of the Department of Transportation, the Department of Transportation, Deputy Maritime Administrator William A. Creelman, and MarAd (referred to collectively as "Federal Defendants"), intervenor/consolidated-plaintiff Sea-Land Service, Inc. ("Sea-Land"), and intervenor/consolidated-plaintiff Puerto Rico Maritime Shipping Authority ("PRMSA").[1] All parties have filed motions or cross-motions for summary judgment concerning the Final Statutory Interpretation and, in some cases, several other directives, issued by MarAd.

I. FACTS
Sea-Barge operates ocean-going tugs and barges between ports in the United States (Miami and Jacksonville, Florida), and ports of Puerto Rico. The Department of Transportation is responsible, inter alia, for implementing the terms of the Merchant Marine Act. Some of the Department of Transportation's duties have been delegated to the MarAd.
PRMSA is a common carrier operating vessels in the trade between ports on the United States Atlantic and Gulf Coasts, Puerto Rico, the Dominican Republic, the U.S. Virgin Islands, Haiti, and Trinidad.
Sea-Land operates as a common carrier in international, foreign and domestic off-shore trades, including operations involving combined domestic and foreign cargos ("mixed-use voyages") that operate between the United States and Puerto Rico and foreign countries in the Caribbean. In March, 1988, Sea-Land bought three Lancer vessels[2] and PRMSA bought five Lancer vessels, at a United States Marshal's auction following the bankruptcy of United States Lines, Inc. The vessels had been built in the 1960's for United States Lines with the aid of construction differential subsidies ("CDS") pursuant to the Merchant Marine Act of 1936, 46 U.S.C. § 1101 et seq. (1982) ("the Act").
In a letter dated April 21, 1988, Sea-Land asked MarAd to confirm that Section 506 and the relevant CDS contractual provisions did not prohibit the operation of the Lancer vessels on following itinerary: Elizabeth, New Jersey to San Juan, Puerto *24 Rico to Jacksonville, Florida to San Juan to Kingston, Jamaica to New Orleans, Louisiana to San Juan to Elizabeth. Sea-Land stated that at least one container of cargo (presumably the same one) would be carried from Elizabeth to Kingston and one container of cargo would be carried from Kingston to Elizabeth.[3] In addition, Sea-Land stated that the crew would be on "foreign articles" for the entire voyage. Administrative Record ("A.R."), at 1480.[4] By letter dated May 16, 1988 ("May 16 Letter"), MarAd approved the proposed itinerary as permissible using the Lancer vessels provided that Sea-Land: (1) carried one hundred long tons of cargo (five TEUs), "in the foreign commerce of the United States" for each such voyage; and (2) "advertised to offer cargo carriage between the U.S. and foreign ports and ardent effort shall be made to solicit and secure such cargoes." A.R. at 1482.
Several interested parties questioned the May 16 Letter in letters written to MarAd. A.R. at 1484-91. In light of these letters, MarAd, on September 7, 1988, indicated that it would reconsider the informal advice given in the May 16 Letter and would receive comments on the issue from interested parties. A.R. at 1492-93. Interested parties in the Caribbean and Hawaiian trades became aware of the dispute and submitted informal comments through November of 1988. A.R. at 1368-1501.
On June 6, 1989, MarAd issued a Final Opinion and Order for "Docket A-179" ("June 6 Opinion"), discussing the meaning of the "Fourth Exception" to Section 506.[5] A.R. at 1269-1334. The June 6 Opinion held that the term "may stop" means "may stop once" at a United States possession or territory either in the course of a foreign voyage or "once inbound and once outbound,"[6] and that Sea-Land's itinerary consisted of several voyages. A.R. at 1288, 1308 and 1331. The June 6 Opinion also indicated that there was a need to establish guidelines on the cargo-mix issue. On June 12, 1989, MarAd published a notice in the Federal Register, 54 Fed.Reg. 24976, referring to the June 6 Opinion and inviting comments on the appropriate cargo-mix under the Fourth Exception of Section 506. MarAd stated that the reason it solicited comments was because:
[t]he owners and operators of CDS-built vessels need to know the scope of operations which will not jeopardize or breach their CDS contracts. The Jones Act vessel operators and owners need to know such scope so that they can make reasonable business decisions on their operations.
On August 14, 1989, Sea-Barge filed suit in this court claiming that MarAd's failure to issue a rule that prohibits the carriage of more than 50 percent domestic cargo in the mixed Puerto Rican/Caribbean trades violated Section 506 of the Act. Complaint at ¶ 33. Sea-Barge asked the court to issue such a 50 percent interpretation or to order MarAd to do so. On September 27, 1989, this court issued an order dismissing Sea-Land and PRMSA as defendants in the Sea-Barge action and directing the Federal Defendants to file dispositive motions within thirty days unless MarAd agreed to issue an interim interpretation of Section 506 within that time frame. On October 27, 1989, MarAd issued its Interim Statutory Interpretation, A.R. at 721-775, which provided that:
[e]ffective immediately for voyages for which cargo is not booked, but for all voyages no later than November 27, 1989, to be considered a bona fide voyage in foreign trade under the Fourth Exception of Section 506, each voyage of a CDS-built vessel may stop once inbound and once outbound at Puerto Rico and, at a maximum at any time during *25 the voyage, carry domestic cargo equal to 75 percent of the total capacity of the vessel on each voyage. Operators involved in such service must report cargo carriage on a semiannual basis. Interested parties may submit their views on this interim interpretation until November 27, 1989. Marad will consider those views before issuing a final interpretation.
A.R. at 775. The Interim Statutory Interpretation was published in the Federal Register as a proposed final rule and comments were invited. On January 31, 1990, MarAd issued its Final Statutory Interpretation, A.R. 308-35, which held:
For the reasons set forth [in this Final Statutory Interpretation and] in the June 6, 1989 Opinion and Order, [and] the October 27, 1989 Interim Statutory Interpretation ... MARAD concludes as its Final Statutory Interpretation the following:
Effective on and after March 1, 1990, with respect to CDS-built container vessels carrying cargo between the U.S. mainland and foreign countries, via Puerto Rico, to be considered a bona fide voyage in the foreign trade under the Fourth Exception of Section 506, each voyage of a CDS-built vessel may stop only once inbound and once outbound at Puerto Rico, and, at a minimum, the vessel must carry foreign cargo equal to 25 percent of the total TEUs carried on the vessel on each voyage on a round trip basis. Operators involved in such service will be required to report cargo carriage on a quarterly basis.
A.R. at 334-35. On February 28, 1990, MarAd issued an Addendum, A.R. 64a-71, which modified the Final Statutory Interpretation as follows:
Effective on and after April 1, 1990, with respect to CDS-built container vessels carrying cargo between the U.S. mainland and foreign countries via Puerto Rico, to be considered a bona fide voyage in the foreign trade under the Fourth Exception of Section 506, each voyage of a CDS-built vessel may stop only once inbound and once outbound at Puerto Rico, and, at a minimum, the vessel must carry foreign cargo equal to 25 percent of the total TEUs carried on the vessel on a voyage basis. Failure to meet that level of carriage will result in a rebuttable presumption, that the voyage is not one in foreign trade. This rebuttal is effective in normal circumstances, but MARAD retains the right to assure that the carrier has taken sufficient steps to carry significant quantities of foreign cargo on each voyage in deciding whether the presumption has in fact been rebutted. The failure of quarterly results to achieve the required results can be excused only by MARAD finding that circumstances caused by force majeure precluded the operation of CDS-built vessels from otherwise meeting the 25 [percent] requirement. Operators involved in such service will be required to report cargo carriage on the same quarterly basis.
A.R. at 71.
On April 9, 1990, MarAd declined requests for review of the Final Statutory Interpretation or the Addendum. A.R. at 1-2.
On April 25, 1990, Sea-Barge filed its Second Amended Complaint which seeks the following relief: (1) a declaration that CDS-built vessels may not be operated in the United States/Puerto Rico trade unless at least 50 percent of the cargo capacity of each vessel on each transit between two ports is reserved for cargo in the foreign trade of the United States; (2) a declaration that cargo of foreign origin or destination that is transshipped[7] by a CDS-built vessel between a port in the continental United States and a port in Puerto Rico be *26 excluded from the calculation of foreign cargo necessary to meet the requirements of Section 506; (3) judgment that the Federal Defendants have violated the Administrative Procedure Act ("APA"); (4) an order that the Federal Defendants rescind the last paragraph of the June 6 Opinion which purports to authorize continued use of subsidized vessels in the United States/Puerto Rico trade; (5) a permanent injunction enjoining Federal Defendants from violating the Merchant Marine Act; and (6) other relief which the court deems appropriate.
Sea-Barge then filed a motion for summary judgment which contained three requests. First Sea-Barge asked the court to find that Section 506 is clear on its face as a matter of law and that MarAd's Final Statutory Interpretation is arbitrary and capricious insofar as it finds that 75 percent of the capacity of any CDS vessel can be used to transport domestic cargo on the foreign trade routes discussed in the Final Statutory Interpretation. Sea-Barge Motion at 1-2. Second, Sea-Barge asked the court to issue an order declaring that the CDS vessels at issue in the disputed trade must carry foreign cargo amounting to at least 50 percent of its total domestic and foreign cargo at all times. Third, Sea-Barge asked that the court find that transshipped cargo should be deemed to be domestic cargo for purposes of Section 506.
As intervenors, both Sea-Land and PRMSA individually cross-moved for summary judgment.[8] Sea-Land argued that it is entitled to summary judgment dismissing the Second Amended Complaint insofar as Section 506 does not support a construction that CDS-built vessels in the disputed trade must carry foreign cargo amounting to at least 50 percent of its total domestic and foreign cargo. Sea-Land also argued that Sea-Barge's claim that transshipped foreign cargo should be treated as "domestic" cargo was neither properly presented to nor decided by MarAd and is therefore not presently susceptible to judicial review. Similarly, PRMSA urged dismissal of Sea-Barge's Second Amended Complaint because Section 506 does not authorize MarAd to impose percentage limitations on domestic cargoes. PRMSA also argued that the Final Interpretation is arbitrary and capricious.
On April 26, 1990, both Sea-Land and PRMSA filed independent actions which, as is explained above, have been consolidated with the first lawsuit. In its complaint, Sea-Land asks the court to: (1) declare that Federal Defendants have arbitrarily and capriciously interpreted Section 506 in violation of the APA; (2) enjoin the Federal Defendants from enforcing, and require them to rescind, the Final Statutory Interpretation and MarAd's determination of what constitutes a voyage in foreign trade; (3) enjoin Federal Defendants from issuing any other future statutory interpretations superimposing any numerical standard or other arbitrary and capricious standard on Section 506; (4) award Sea-Land costs and reasonable attorneys' fees; and (5) grant such other relief as the court deems appropriate.
PRMSA asks the court, in its complaint, to: (1) issue an injunction requiring Federal Defendants to rescind the June 6 Opinion, the October 27 Letter, and the Final Statutory Interpretation; (2) declare that the Federal Defendants lack the authority to make the findings and issue the restrictions in those rulings; (3) declare that, by issuing those rulings, Federal Defendants exceeded their statutory authority and violated the APA's proscriptions against decisions issued without notice and opportunity for comment as well as arbitrary and capricious and not in accordance with law; and (4) grant such other relief as it deems appropriate.
Sea-Land and PRMSA have moved individually for summary judgment with respect *27 to their consolidated cases. Both Sea-Land and PRMSA assert that MarAd lacks the statutory authority to prescribe an acceptable level of domestic carriage for operators of CDS-built vessels. Sea-Land also alleges that MarAd's definition of voyage is arbitrary, capricious and contrary to law. PRMSA claims that MarAd's June 6 opinion, regarding the itinerary restriction and the agency's authority to establish a foreign cargo percentage limitation, violates the APA because it was considered and issued without notice and hearing for PRMSA. PRMSA further asserts that the Final Statutory Interpretation and October 27 Letter are unreviewable because they are unintelligible. PRMSA also alleges that MarAd's definition of voyage and its decision on the itinerary restriction are inconsistent with the plain language of Section 506.
Federal Defendants, in their motion for summary judgment, ask the court to: (1) affirm MarAd's Final Statutory Interpretation; (2) grant summary judgment in favor of Federal Defendants; and (3) dismiss Sea-Barge's, Sea-Land's and PRMSA's complaints.

II. LEGAL STANDARD
The language of Rule 56(c) of the Federal Rules of Civil Procedure indicates that summary judgment is appropriate when examination of the record as a whole reveals "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In examining the record, the court must view all inferences in the light most favorable to the non-moving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
The scope of a court's review of an agency's exercise of its rulemaking authority is limited. United Mineworkers of America, International Union v. Dole, 870 F.2d 662, 666 (D.C.Cir.1989). Pursuant to Chevron, the court must first consider whether Congress manifested an "unambiguously expressed intent" that resolves the dispute of the statute's meaning. Abbott Laboratories v. Young, 920 F.2d 984, 987 (D.C.Cir.1990), cert. denied sub nom. Abbott Laboratories v. Kessler, ___ U.S. ___, 112 S.Ct. 76, 116 L.Ed.2d 49 (1991) ("Abbott Labs") (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984)). The language of the statute in question is the best indication of congressional intent. Abbott Labs, 920 F.2d at 987. If the statute clearly speaks to the issue, then the reviewing court need not defer to the agency's interpretation because the court is in as good a position as agency to interpret and apply the statute. The court may also look to the statute's legislative history to determine whether Congress clearly addressed the issue. See id. at 988.
On the other hand, if the language of the statute does not clearly address the issue at hand, the court must then proceed to the second step of Chevron and ask whether the agency's construction "falls within the bounds of reasonableness." Id. The court in Abbott Labs stated that "[t]he `reasonableness' of an agency's construction depends on the construction's `fit' with the statutory language as well as its conformity to statutory purposes." Id. It is in this context that agencies are to use their discretion when interpreting the statute and that the reviewing court is to defer to their expertise and judgment.
When reviewing an agency's action under the second step of Chevron, the APA applies. Pursuant to the APA, a court reviewing agency action will hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1982). In general, this standard of review is highly deferential and presumes agency action to be valid. See Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C.Cir.1981) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The court must affirm the agency's decision if a rational basis for that decision exists, even if *28 the court disagrees. Costle, 657 F.2d at 283. While deferential to agency action, the court's review of the facts must be searching and careful; the agency's action must be based on a consideration of relevant factors. Id. The scope of the court's review of agency action is usually confined to the full administrative record before the agency at the time the agency action was taken. Volpe, 401 U.S. at 825, 91 S.Ct. at 1066.[9]
The standard that the United States Court of Appeals for the District of Columbia has applied when determining the validity of a rule promulgated under the Act is arbitrary or capricious was set forth in Independent U.S. Tanker Owners Comm. v. Dole, 809 F.2d 847, 854 (D.C.Cir.) cert. denied sub nom. Atlantic Richfield Co. v. Independent U.S. Tanker Owners Comm., 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987) ("ITOC II"). In that case appellants challenged the Secretary of Transportation's rule which permitted CDS-built vessels to operate in domestic trade if they agreed to repay the unamortized portion of the subsidy plus interest. Id. at 850. The Secretary stated that the rule was designed to serve such interests as economic efficiency, use of underemployed resources, increased competition and deregulation. Id. at 853.
The court in ITOC II first addressed the Secretary's authority to promulgate such a rule and found that she had the authority under the statute to do so. Id. at 850-51. The court then considered whether the Secretary's rule was arbitrary or capricious, an abuse of discretion or otherwise not in accordance with law. Id. at 851-55. In doing so the court reviewed the APA's standard for rulemaking and noted that when an agency makes a rule it should provide a "concise general statement" of the basis and purpose of that rule. Id. at 852 (citing 5 U.S.C. § 553(c) (1982)). The court stated that "such a statement should indicate the major issues of policy that were raised in the proceeding and explain why the agency decided to respond to these issues as it did, particularly in light of the statutory objectives that the rule must serve." ITOC II, 809 F.2d at 852 (cites omitted).
The court then reviewed the objectives of the Merchant Marine Act[10] and held that the rule failed to meet this standard. Id. The court stated that the rule did not adequately explain how it served the objectives of the Act and why alternative measures were rejected in light of those objectives. Id. The court held that "[t]he Secretary's treatment of these objectives, and the concerns raised about them in the comment proceedings, is cursory at best." Id. The court concluded that:
the Secretary must spell out in more detail how her decision to adopt this rule and reject alternative measures by relying on policies of competition and deregulation can be squared with the statutory objectives that Congress specified as the primary guidelines for administrative action in this area.... [I]n the absence of any such discussion, this court can only conclude that her action is "arbitrary, capricious ... or not otherwise in accordance with law."
Id. at 854 (cites omitted).
The Court of Appeals for this circuit applied this same standard when reviewing a rule promulgated by MarAd in Independent U.S. Tanker Owners Comm. v. Skinner, 884 F.2d 587 (D.C.Cir.1989) cert. denied 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990). In that case the court upheld a similar rule which allowed a subsidized vessel to operate in domestic trade if it repaid its CDS with interest. Id. at 589. The court upheld this rule because the agency stated upon adopting the rule that it promoted two statutory objectives; ensuring that the "most suitable types of vessels" made up the merchant marine and helping to ensure that the merchant marine *29 will be a well balanced fleet. Id. at 592. The court noted that MarAd had adequately considered the rule's effect on domestic trade, foreign commerce as well as national security. Id. at 593-94. Further, the court found that MarAd had properly examined each of the alternatives presented and "persuasively argue[d] that ... the rule better serves the Act's overall goals." Id. at 594.
In a third case the Court of Appeals for this circuit reviewed still another rule by MarAd which permitted a CDS-built vessel to continue to receive subsidy payments after engaging in two domestic voyages. American Trading Transportation Co. Inc. v. United States, 841 F.2d 421 (D.C.Cir.1988). MarAd, in this decision, merely stated that its rule was "necessary and appropriate to carry out the purposes of the Act." Id. at 424.
The court, in striking down the agency's rule, stated that it had two responsibilities when reviewing a substantive decision by MarAd. Id. The court held that it first had to ensure that the decision was not arbitrary or capricious, and second that it must "examine the procedure MarAd employed in reaching its decision to ensure that they would comply with the APA and any applicable statutory or constitutional requirements." Id. (citing Independent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908 (D.C.Cir.1982) ("ITOC I")[11] (in which the court held that the APA required that MarAd state the basis and purpose of its decision so as to enable the court to determine what major policies were ventilated by the informal proceeding and why the agency reacted to them as it did)). The court vacated the lower court's holding which upheld MarAd's disposition because the decision failed to follow the standard set forth in ITOC I. American Trading, 841 F.2d at 422-23. The court stated that "MarAd should not have rested on repetition of the words of the statute, but should have stated, concretely, the rationale for its rulings." Id. at 425 (citing ITOC I, 690 F.2d at 924).
Fortunately, there is no lack of guidance, both from Congress and the Court of Appeals for this circuit, regarding the purpose of the Merchant Marine Act. The primary purpose of the Act was stated by Congress:
It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping services essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

46 U.S.C. § 1101 (1982) (emphasis added).
Since the cost of building, maintaining and operating ships is much higher in the United States than it is abroad, Congress has taken various steps to maintain a competent merchant marine with trained American sailors and capable United States flag ships. ITOC I, 690 F.2d at 912. Under the Jones Act, except for some very limited exceptions, Congress has reserved the domestic commerce of the United States for vessels "built in and documented under the laws of the United States and owned by persons who are citizens of the United States." 46 U.S.C. § 883 (Supp.1991). The *30 unsubsidized domestic fleet is commonly referred to as the "Jones Act fleet."
Such protective legislation, however, is not possible in foreign commerce. ITOC I, 690 F.2d at 912. Thus, Congress has, for many years, authorized subsidies for ships that are built in the United States that are to be used in foreign trade. Id. Under the Construction-Differential Subsidies program, the government may pay up to 50 percent of the construction costs of a vessel needed for the United States' foreign maritime trade. Id. CDS's are designed to promote the foreign commerce capacity of the United States merchant marine. CDS's are available only for vessels which are to be engaged in the foreign commerce of the United States. 46 U.S.C. § 1151 (Supp.1991); see 46 U.S.C. § 1159 (Supp. 1991). Moreover, the CDS is gauged by the cost differential in building a given vessel in a United States shipyard as compared to a foreign shipyard. 46 U.S.C. § 1152(b) (Supp.1991).
For obvious reasons, the Jones Act fleet is incapable of competing with the subsidized fleet. ITOC I, 690 F.2d at 912. Thus, in order to protect the entire merchant marine, a second purpose of the Act is "to protect the unsubsidized domestic fleet from displacement by the subsidized fleet, while still ensuring adequate domestic shipping capacity." Atlantic Richfield Co. v. United States, 774 F.2d 1193, 1203 (D.C.Cir.1985). See also American Trading Transportation Co. v. United States, 791 F.2d 942, 948 (D.C.Cir.1986).
The Supreme Court has recognized that the domestic operation of subsidized vessels could disadvantage the Jones Act fleet. In Seatrain Shipbuilding Corp. et al. v. Shell Oil Co. et al., 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980), the Court stated that:
[i]t was recognized from the outset that substantial limits would have to be placed on the entry of subsidized vessels into the domestic trade. Any other result would have been disastrous for the unsubsidized Jones Act fleet for which that trade was (and is) reserved. Burdened by higher construction costs, greater outstanding debt, and higher operating expenses that fleet would simply have been unable to compete with new vessels enjoying the benefits of the 1936 Act.
Id. at 586-87, 100 S.Ct. at 808-09.
Congress protects the Jones Act fleet by limiting subsidized vessels' participation in domestic trade to "narrowly circumscribed conditions." Atlantic Richfield Co., 774 F.2d at 1204 (footnote omitted). These conditions are the four exceptions set forth in Section 506. Section 506 states:
Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the state of Hawaii, or an island possession or island territory of the United States, and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay annually to the Secretary of Transportation that proportion of one twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year. The Secretary may consent in writing to the temporary transfer of such vessel to service other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this Act. Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary upon such terms and conditions as it may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such *31 temporary period bears to the entire economic life of the vessel. No operating-differential subsidy shall be paid for the operation of such vessel for such temporary period.
46 U.S.C. § 1156.[12]

III. DISCUSSION
Section 506 states six permissible uses of CDS vessels. The voyage at issue in this case involves the so-called fourth exception to the exclusive use in foreign trade requirement ("Fourth Exception").[13] The Fourth Exception permits the use of a CDS vessel "on a voyage in foreign trade on which the vessel may stop at the state of Hawaii, or an island possession or island territory of the United States" as long as a proportion of the CDS is repaid as provided by Section 506. The Fourth Exception applies to the present dispute because this case involves the permissibility of voyages in trade in which CDS-built vessels carry both domestic and foreign cargo, and call at ports of the United States, an island possession and a foreign country.
Finding the Fourth Exception applicable to the present dispute, the court must determine whether there is any genuine issue of material fact as to whether MarAd's interpretation of that exception is arbitrary and capricious according to the standard enumerated supra. This determination requires the court to analyze three aspects of MarAd's interpretation: (1) the definition of "voyage in foreign trade;" (2) the definition of "may stop;" and (3) whether transshipped cargo must be considered to be domestic or foreign cargo for purposes of Section 506.[14]
Under the standard enumerated in ITOC II, the first question the court must address is whether MarAd has the authority to issue this rule. The Fourth Exception uses the terminology "on a voyage in foreign trade." No provision in the Merchant Marine Act expressly defines or sets parameters as to what level of foreign cargo constitutes a voyage in foreign trade. Similarly, the Act does not define "may stop" or address the issue of transshipped cargo.
It is clear that MarAd has the authority to issue this rule. The Supreme Court has recognized both explicit and implicit congressional grants of authority to administrative agencies to implement statutory schemes. Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Supreme Court has also recognized that Congress gave the Secretary of Transportation "broad authority to oversee administration of the [Merchant Marine] Act." Seatrain, 444 U.S. at 585, 100 S.Ct. at 808.[15]See also Liberty Maritime Corp. v. United States, 928 F.2d 413, 419 (D.C.Cir.1991). The applicable Department *32 of Transportation Regulation explicitly delegates to the Maritime Administrator the "authority to ... [c]arry out the Merchant Marine Act." 49 C.F.R. § 1.66(e) (1990).
Thus, the court must address the second question under the ITOC II analysis, which is whether the agency's action was arbitrary or capricious. Again, the court must focus on whether MarAd demonstrated how its decision furthered the purpose and policies of the Act and whether it adequately considered all alternatives presented.
MarAd's rule in the present case does not meet the standard set forth by the Court of Appeals for this Circuit and is therefore arbitrary and capricious. In its Final Statutory Interpretation, MarAd both reviewed the procedural background that led to its final interpretation and discussed policies and purposes of the Merchant Marine Act. A.R. 318-19. MarAd recognized that one purpose of the Act was to protect the Jones Act fleet from displacement by the subsidized fleet. MarAd then noted that setting any percentage limit on the amount of domestic cargo that a CDS vessel may carry and continue to receive its subsidy is difficult, but that this difficulty should not deter it from doing "its duties." Id. at 323.
Next, MarAd reviewed the alternatives that were presented by various parties in response to the notice requesting comment that was published in the Interim Statutory Interpretation. MarAd rejected one party's[16] suggestion that the rule should be based upon relative cargo volumes because it was unrealistic. Id. at 324. PRMSA contended that a 25 percent limit was arbitrary and capricious because bona fide voyages in foreign trade may carry less than this amount of foreign cargo. MarAd dismissed this argument because even if a bona fide voyage in foreign trade could carry less than 25 percent of foreign cargo, a limit under 25 percent would "allow too great a possibility of permitting sham foreign voyages." Id. at 324-25. MarAd stated that the 25 percent limit assures that voyages in foreign trade will be bona fide. Id. Further, MarAd stated that its rule also has the advantages of being self-executing, fair to all participants and easily administered. Id. at 325.
MarAd also refused to accept PRMSA's proposal that MarAd adopt a policy that considers a voyage to be one in foreign trade if the revenue generated from the foreign trade segment exceeds the incremental cost of providing that service in conjunction with domestic service. Id. at 327. MarAd rejected this proposal because it would not put a meaningful limit on the carriage of domestic cargo in the Puerto Rican trade and because such a limit would not demonstrate that a voyage is a bona fide voyage in foreign trade. Id.
The final alternative that MarAd considered was presented by Sea-Barge. MarAd refused to accept Sea-Barge's proposal that the foreign cargo limit be set at 50 percent because of the six-month waivers that appear in the second sentence of Section 506. Id. at 328. MarAd stated that the six-month waivers are separate exceptions and are easily distinguishable from the Fourth Exception because the Fourth Exception is much more limited. Id.
MarAd then declared that it "reviewed whether this Final Statutory Interpretation would contravene the purposes and policy of the Act, and has concluded it would not." Id. at 328-299. In support of this statement MarAd rejected Sea-Barge's claim that the 25 percent rule has and would continue to cause it commercial harm because Sea-Barge has failed to substantiate such claims. Id. at 329-30. Similarly, MarAd did not accept PRMSA's claim that it needs to use CDS vessels for shipping from the United States to Puerto Rico because PRMSA did not demonstrate how such trade would be jeopardized by the 25 percent foreign trade requirement. Id. at 330.
MarAd concluded by stating that the "25 percent minimum foreign cargo of the total cargo, measured in TEUs, is the appropriate standard for carriage of foreign cargo on a voyage and is fully justified on the *33 basis of its legal interpretation." Id. at 331. MarAd reached this conclusion "[f]or the reasons set forth in the June 6, 1989 Opinion and Order, the October 27, 1989 Interim Statutory Interpretation and above." Id. at 334.
After releasing its Final Statutory Interpretation, MarAd issued the Addendum to clarify that Interpretation. Id. at 64a. In this Addendum, MarAd addressed PRMSA's assertion that the Final Statutory Interpretation would make it difficult to handle their cargo because carriage decisions are often not made until the last minute before departure. Id. at 67. MarAd also considered Sea-Land's argument that the rule made it "impossible to develop safely and efficiently a vessel stowage plan under the conditions imposed by the final interpretation." Id. at 68. MarAd then considered Sea-Barge's claim that Section 506 must be given full effect even if it restricts the operation of CDS vessels. Id. at 69.
MarAd recognized that the Final Statutory Interpretation would result in some unnecessary disruption of shippers' ability to ship cargo. Id. Thus, MarAd concluded by holding that the 25 percent foreign cargo standard would remain the rule, but that its rule would not be measured strictly on a voyage by voyage basis. Id. Rather, MarAd instituted the presumption standard. According to the Addendum, a failure to meet the 25 percent requirement on a particular voyage will result in a rebuttable presumption that the voyage is not in foreign trade, but that in order to provide appropriate operating flexibility the presumption may be rebutted by the cumulative results of voyages completed in a quarter in this trade where the total quarterly results do meet the 25 percent minimum foreign cargo. Id.
MarAd's Interim Statutory Interpretation, which set the 25 percent limit on foreign cargo requirement for CDS vessels, also stated that subsidized vessels may only stop once inbound and once outbound at Puerto Rico for a voyage to be considered a voyage in foreign trade for the purposes of the Fourth Exception. Id. at 772. MarAd provided two rationales for this rule. First, MarAd stated that the Secretary retained the authority to consent to full-time domestic service for six months out of the year, and that if the percentage level of foreign cargo were set at 50 percent and shippers got a six month waiver, the total percentage of foreign cargo carried for the year would be 25 percent. Id. at 772-73. Second, MarAd stated that "[i]t is highly unlikely that every voyage will carry the maximum amount of domestic cargo." Id. at 773. In its Final Opinion of June 6, 1989, MarAd held that "may stop" in the Fourth Exception means "may stop once," id. at 1287-88, 1294-95, and that MarAd has the authority to determine what mix of domestic and foreign cargo constitutes bona fide foreign trade for the purposes of § 506. Id. at 1328-31.
There is no genuine issue of material fact, and according to the law of this Circuit, MarAd's rule interpreting the Fourth Exception to Section 506 in this case is arbitrary and capricious. Neither the Final Statutory Interpretation, the Interim Statutory Interpretation nor the June 6 Opinion, satisfies the standards for reasonableness set in ITOC II or I. MarAd did restate the purpose, policy and history of the Act in the Final Statutory Interpretation, and then asserted that the 25 percent rule does not contravene the policy of the Act. This showing, however, does not pass muster. MarAd must not merely parrot the language of the statute and state that its rule furthers the purpose and policies of the Act. Rather, MarAd must demonstrate how its rule furthers the purpose and policy of the Act. Nowhere in its rule or in the Administrative Record does MarAd explain why or show how its 25 percent minimum foreign cargo requirement coupled with the "may stop once" interpretation will further the underlying purpose of the Act.
MarAd also considered the alternatives presented by various interested parties and rejected them because they would not adequately serve the purpose of the Act. MarAd rejected PRMSA's and Sea-Land's suggestion that there be no percentage limit. MarAd similarly rejected Sea-Barge's 50 percent minimum foreign cargo limit as *34 well as PRMSA's suggestion that the determination be based upon the relative revenues earned on the foreign versus domestic segments of the voyage. But again, MarAd never stated, "concretely" or otherwise, how or why its Final Statutory Interpretation serves or furthers the policy of the Act.
The court recognizes that, as MarAd points out, one of the Act's primary policies is to protect the Jones Act fleet from being displaced by the subsidized fleet, and that this is achieved by preventing CDS-built vessels from engaging in domestic trade, either directly or by way of sham foreign voyages. Thus, it is evident that MarAd must set some sort of minimum foreign cargo limit to assure that voyages in foreign trade are bona fide.[17]
In the present case, however, MarAd fails to demonstrate how its 25 percent rule will protect the Jones Act fleet from displacement by the subsidized fleet. MarAd merely states in a conclusory fashion that a limit under 25 percent would create too great a possibility for sham voyages and that its 25 percent rule will assure that voyages in foreign trade are bona fide. Such a conclusory statement, however, does not satisfy the requirement that MarAd explain how its rule serves the objectives of the Act. See ITOC II, 809 F.2d at 852. MarAd also does not state why it reacted as it did in choosing 25 percent. See ITOC I, 690 F.2d at 908. Further, MarAd's rule is deficient in much the same way that its rule in American Trading was lacking; that it merely repeats the words of the statute and its policy but did not provide a rationale for choosing 25 percent instead of any other limit. American Trading, 841 F.2d at 425. MarAd's rationale for its rule, that it will protect the Jones Act fleet from displacement by preventing sham foreign voyages by CDS-built vessels, only shows that there must be some limit on the amount of domestic cargo that CDS-built vessels may carry on subsidized foreign voyages.
A plain reading of the statute seems to indicate that the foreign cargo limitation should be set at the level at which the domestic cargo carried on a CDS-built vessel is incidental to foreign cargo that is carried on that voyage. Such a limitation would truly protect the Jones Act fleet because it would assure that voyages in foreign trade are bona fide; they would not be taken but for the purpose of transporting the cargo to foreign ports. Any limit that allows CDS-built vessels to carry more than this amount of domestic cargo would allow sham voyages in foreign trade, thus giving CDS-built vessels a competitive advantage over the Jones Act fleet in domestic trade.
There are two problems with MarAd's rule. The first problem is that the court is unclear why the limit on the domestic cargo that may be carried by CDS-built vessels should be measured purely in terms of the volume of foreign and domestic cargo that is being carried as opposed to also considering the value of that cargo. MarAd does not explain how it can determine, based only on a percentage of foreign versus domestic cargo that is measured strictly in terms of volume, whether a foreign voyage is bona fide. MarAd does not demonstrate why a CDS-built vessel carrying foreign cargo that makes up only a small percentage of the vessel's total cargo, say less than 25 percent, but which is more valuable to ship than all of the domestic cargo on board and accounts for most of the profit made on that voyage, is not engaged in a bona fide voyage in foreign trade. It seems that in such a case the domestic cargo on board is incidental to the foreign cargo despite the fact that it accounts for a great majority in terms of *35 volume of the total cargo that is being shipped.
The court recognizes that MarAd rejected PRMSA's suggestion that a voyage in foreign trade should be measured in terms of the revenue earned from the domestic versus foreign legs of the voyage because it would not provide a meaningful limit and because it would not assure bona fide voyages in foreign trade. MarAd, however, does not explain why the value of the foreign and domestic cargo should never be considered, even if it is considered in conjunction with a percentage limit based on volume. MarAd also does not demonstrate why a rule considering profit would not assure bona fide voyages in foreign trade.
The second problem is that even if MarAd adequately explained why bona fide voyages in foreign trade should be measured solely in terms of the volume of foreign versus domestic cargo carried, the court is unable to determine why MarAd's 25 percent minimum foreign cargo requirement assures that voyages in foreign trade are bona fide whereas any other percentage limit between zero and 50 would not. MarAd does not show, by way of statistical evidence, market research or otherwise, that domestic cargo which amounts to 75 percent or less of the total cargo on board a CDS-built vessel engaged in a voyage in foreign trade is incidental to the foreign cargo being shipped. Thus, MarAd does not demonstrate why or how CDS-built vessels which carry less than 75 percent of domestic cargo are likely to be engaging in bona fide voyages in foreign trade.
MarAd states that its 25 percent limit is a clear-cut, bright-line rule that is easy to administer. This argument cannot be disputed. But, it is equally clear that this rationale would also hold true for any other percentage level that could be selected.
The court is uncomfortable with its decision to remand this case back to MarAd since that course appears to be inconsistent with other areas of APA law in which the reviewing court is more deferential to the agency. Often, the burden of proof lies with the party challenging the agency's action to demonstrate that the agency's action is arbitrary or capricious rather than with the agency to show that its action is not arbitrary and capricious because it furthers the purpose of the statute. See National Small Shipments Traffic Conference, Inc. v. I.C.C., 725 F.2d 1442, 1455 (D.C.Cir.1984) (in which the court held that "aggrieved parties bear the burden of demonstrating to the court that challenged agency action merits reversal.") See also Stuart-James Co. v. S.E.C., 857 F.2d 796, 800 (D.C.Cir.1988), cert. denied 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1002 (1989); Mazaleski v. Treusdell, 562 F.2d 701, 717 n. 38 (D.C.Cir.1977); McLeod v. I.N.S., 802 F.2d 89, 95 (3d Cir.1986). The ITOC II standard is, however, the law of this circuit regarding Section 506 and the court is bound to follow that law.
It is important to note that the court does not pass on the issue of whether the 25 percent minimum limit on foreign cargo is a good or bad rule, or whether it furthers and serves the purpose and policies of the Act or not. It could be that given the nature of the shipping industry, the impracticality of judging such issues on a case by case basis and the need for a clear-cut rule that MarAd's rule is the best available. In practice, MarAd's 25 percent rule may in fact be the best approximation of the level at which the domestic cargo on board a CDS-built vessel is incidental to the foreign cargo on board and thus CDS-built vessels carrying less than this amount of foreign cargo are likely to be engaged in sham voyages in foreign trade whereas CDS-built vessels carrying over this amount are truly engaging in bona fide voyages in foreign trade. The point is that the court is unable to determine from the Administrative Record whether this rule in fact furthers the underlying policy of the Act.
Since the court must remand this case back to the agency there is no need for the court to address at this time the issues of whether the MarAd's itinerary restriction also furthers the policy of the Act or whether transshipped cargo should be considered as domestic or foreign cargo for the purposes of the Fourth Exception. It *36 may be advisable, however, for MarAd to consider these issues when reconsidering this rule. Both issues should be addressed in terms of how they bear on the question of whether the domestic cargo on board a CDS-built vessel is incidental to the foreign cargo carried. It appears that transshipped cargo should be treated as domestic cargo because for the purposes of the individual voyage in question this cargo is merely being shipped either from a United States port to Puerto Rico or vice versa.
PRMSA claims that MarAd's June 6 Opinion, with regard to the issues of the need for a statutory interpretation, MarAd's authority to establish cargo-mix guidelines and the itinerary issue violated the APA's notice and hearing requirements. PRMSA asserts, in essence, that the June 6 Opinion was a rulemaking and that it did not receive adequate notice and opportunity to comment prior to its promulgation.
The APA requires agencies to provide adequate notice of its proposed rulemaking to allow "interested parties a reasonable opportunity to participate in the rulemaking procedure." Florida Power & Light Co. v. United States, 846 F.2d 765, 771 (D.C.Cir.1988), cert. denied 490 U.S. 1045, 109 S.Ct. 1952, 104 L.Ed.2d 422 (1989) (citing 5 U.S.C. § 553 (1982)). Such notice must provide both adequate time for comments and rationale for the rule to allow interested parties the opportunity to comment meaningfully. Id. (cites omitted).
MarAd satisfied these requirements prior to issuing its rule in this case. Before issuing its June 6 Opinion, MarAd invited interested parties to comment on the preliminary determination that it made in its May 16 letter. A.R. 1492-93. Furthermore, between the time that MarAd issued its June 6 Opinion and its Final Statutory Interpretation, PRMSA has had ample opportunity to submit its comments on these issues. MarAd gave notice and has received comments from interested parties on at least two occasions: after MarAd published its June 6 Opinion it gave notice inviting comments regarding the acceptable level of domestic carriages, A.R. 1266-67, and in its Interim Statutory Opinion MarAd requested that interested parties submit their comments regarding the interim interpretation. Id. at 775. This notice provided both adequate time for comments as well as MarAd's rationale for its rule. Accordingly, PRMSA's claim on this issue shall be denied.
Lastly, Sea-Barge asserts that MarAd has failed to enforce the June 6 Opinion or its subsequent interpretations of Section 506 and that this failure has allowed CDS-built vessels to engage in "virtually unfettered" domestic trade. Points and Authorities in Support of Motion for Summary Judgment of Sea-Barge, 30. Sea-Barge states that the court should retain jurisdiction over this case and require MarAd to submit to the court, within thirty days of the court's order, its plan for enforcing compliance with the court's ruling. Id. at 32.
As the government properly points out, the court cannot require MarAd to enforce its interpretations of Section 506. The APA precludes judicial review of agency actions that are committed to the agency's discretion by law. 5 U.S.C. § 701(a)(2) (1988). The United States Supreme Court, in Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1984), held that judicial review is not available for an agency's refusal to take enforcement steps. The court stated that "an agency's decision not to prosecute or enforce ... is a decision generally committed to an agency's absolute discretion." Id. (citing United States v. Batchelder, 442 U.S. 114, 123-24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979); United States v. Nixon, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967); Confiscation Cases, 74 U.S. (7 Wall) 454, 19 L.Ed. 196 (1869)).
The Court recognized that an agency's decision not to enforce is only presumptively unreviewable, and that this presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Heckler, 470 U.S. at 832-33, *37 105 S.Ct. at 1656 (footnote omitted). The Court noted that Congress may limit or regulate an agency's authority to exercise its enforcement power. Id. at 833, 105 S.Ct. at 1656.
In the present case, Sea-Barge does not point to, and the court cannot find, any language in the Act which limits MarAd's enforcement authority regarding Section 506. Accordingly, MarAd's enforcement authority regarding Section 506 was left by Congress to MarAd's discretion. As a result, MarAd's decisions to enforce this section are not reviewable by this court.
A separate order shall issue this date.

ORDER
This case comes before the court upon Marine Transportation Services Sea-Barge Group, Inc. ("Sea-Barge")'s motion for summary judgment, Sea-Land Service, Inc. ("Sea-Land")'s motion for summary judgment, Puerto Rico Maritime Shipping Authority ("PRMSA")'s motion for summary judgment and the Federal Defendants' motion for summary judgment. For the reasons stated in the memorandum opinion issued this date, it is hereby ORDERED that
1. The court DECLARES that the United States Maritime Administration's ("MarAd's") Final Statutory Interpretation of the Fourth Exception to Section 506 of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1156 (1975 and Supp.1991) ("Section 506"), is arbitrary and capricious.
2. Sea-Barge's motion for summary judgment is GRANTED insofar as MarAd's Final Statutory Interpretation is arbitrary and capricious; is DENIED insofar as construction-differential subsidy ("CDS") vessels must not carry at least 50 percent foreign cargo to qualify as a foreign voyage under the Fourth Exception to Section 506; is DENIED insofar as transshipped cargo must not be deemed domestic cargo for the purposes of Section 506; and is DENIED insofar as the court cannot require MarAd to enforce its interpretation of Section 506.
3. Sea-Land's motion for summary judgment is GRANTED insofar as MarAd's Final Statutory Interpretation is arbitrary and capricious; is DENIED insofar as MarAd has the statutory authority to prescribe an acceptable level of domestic carriage for a CDS vessel.
4. PRMSA's motion for summary judgment is GRANTED insofar as MarAd's Final Statutory Interpretation is arbitrary and capricious; is DENIED insofar as MarAd's Final Statutory Interpretation and October 27 letter are not unintelligible; is DENIED insofar as MarAd's itinerary restriction is not inconsistent with Section 506; and is DENIED insofar as PRMSA was not denied its right under the Administrative Procedure Act ("APA") to notice and opportunity to comment on MarAd's June 6 Opinion.
5. Federal Defendants' motion for summary judgment is DENIED insofar as MarAd's Final Statutory Interpretation is arbitrary and capricious; is GRANTED insofar as transshipped cargo need not be deemed domestic cargo for the purposes of § 506; is GRANTED insofar as the court cannot require MarAd to enforce its interpretation of § 506; is GRANTED insofar as MarAd has the statutory authority to prescribe an acceptable level of domestic cargo for a CDS vessel; is GRANTED insofar as MarAd's June 6 Opinion does not violate the APA; is GRANTED insofar as MarAd's Final Statutory Interpretation is not unintelligible; is GRANTED insofar as MarAd's itinerary restriction is not inconsistent with § 506; and is GRANTED insofar as PRMSA was not denied its right under the APA to notice and an opportunity to comment on the June 6 Opinion.
6. MarAd is ORDERED to make new a determination in accordance with this order and accompanying memorandum opinion. In the meantime, these cases shall stand DISMISSED on the dockets of this court.
7. MarAd shall serve on plaintiffs, and provide other interested parties with, notice of any proposed new interpretation of the Fourth Exception to Section 506 that is made in accordance with this opinion and shall provide all interested parties with the *38 opportunity to submit comments on its new interpretation in accordance with the APA. If any plaintiff does not believe that MarAd's new interpretation of the Fourth Exception to Section 506 complies with the court's order, any plaintiff may seek further relief by reopening its case by motion within 30 days of MarAd's final determination on remand.
SO ORDERED.
NOTES
[1] On April 15, 1991, this court issued an order consolidating two other related actions with Civil Action No. 89-2278, the first case for pretrial purposes. Those two cases are Puerto Rico Maritime Shipping Authority v. James Busey, et al., Civil Action No. 90-969 (D.D.C. filed April 26, 1990), and Sea-Land Service, Inc. v. James Busey, et al., Civil Action No. 90-980 (D.D.C. filed April 26, 1990).

The court has also granted the motion of American President Lines, Ltd. for leave to participate as amicus curiae. American President Lines, Ltd., urges the court to limit its interpretation of the disputed Section 506 provision "to voyages in the trade between the U.S. mainland and Puerto Rico." Amicus Curiae Brief Of American President Lines, Ltd. at 1.
[2] All Sea-Land's and PRMSA's Lancer vessels were built by the same United States shipyard according to the same basic specifications and are considered sister ships. The first vessel was named the S.S. American Lancer; all sister ships carry the "Lancer" designation. Statement Of Material Facts Not In Dispute In Support Of [PRMSA's] Motion For Summary Judgment In C.A. No. 90-0960 And Cross-Motion For Summary Judgment In C.A. No. 89-2278 ("PRMSA's Undisputed Facts"), at 3 n. 4.
[3] One container carries approximately twenty long tons of cargo and is commonly referred to as a [ ... tonnage equivalency Unit ...] or "TEU."
[4] Haina, Dominican Republic and Kingston, Jamaica are foreign ports. Puerto Rico is an island possession or territory within the meaning of Section 506. A.R. at 1287.
[5] The text of the fourth exception is set forth infra.
[6] This interpretation is hereinafter referred to as the "itinerary restriction" or the "may stop once" interpretation.
[7] Transshipped cargo is cargo that is shipped between the United States and Puerto Rico, but whose origin or destination is a foreign port. Sea-Barge defines transshipped cargo as that which is shipped "from a European port destination to Puerto Rico, which [is then] transferred at a continental U.S. port to a C.D.S. vessel for the final leg of the movement to Puerto Rico; or U.S. origin cargo destined for a foreign Caribbean port, and carried on a C.D.S. vessel to Puerto Rico prior to transfer to another vessel for the final leg of carriage to its destination." Sea-Barge Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.
[8] In support of its motion, Sea-Land submitted its Memorandum Of Sea-Land Service, Inc. In Support Of Cross-Motion For Summary Judgment And In Opposition To Plaintiff's Motion For Summary Judgment ("Sea-Land Cross-Memorandum"). In support of its motion, PRMSA submitted its Memorandum Of Points And Authorities Of Intervenor-Defendant [PRMSA] In Support Of Cross-Motion For Summary Judgment ("PRMSA Cross-Memorandum").
[9] Because the Declaration of Michael D. Shea, attached as Exhibit 2 to Sea-Barge's motion for summary judgment, was not part of the administrative record before MarAd, the court will not consider it.
[10] The Act is reviewed in detail infra.
[11] This analysis is slightly different from the standard that was set forth by the court in ITOC II. This difference may be explained by the fact that in ITOC I the court reviewed an informal adjudication whereas in ITOC II the court reviewed a rulemaking. In the present case, the court is reviewing a rulemaking.
[12] The last sentence excluding availability of an operating-differential subsidy ("ODS"), for vessels operating wholly, albeit only temporarily, in the domestic trade supports the interpretation that vessels constructed with a CDS are supposed to be used in the foreign commerce of the United States. The statutory provision concerning granting of an ODS indicates that such a subsidy is available for vessels which are to be used in the "foreign commerce of the United States." 46 U.S.C. § 1171 (Supp.1991). Given the availability of an ODS only for voyages in foreign commerce, the express exclusion of an ODS for vessels temporarily assigned to wholly domestic service  the last provision of Section 506  provides support for a construction of the other provisions of Section 506 which requires that the voyages be in foreign commerce. The requisite minimum amount of foreign commerce then becomes the central issue.
[13] There is a semantic dispute as to the proper terminology to use for the disputed provision of Section 506. Because Section 506 states six permissible uses of CDS vessels, the different permissible uses can be referred to as alternative permissible uses, or "exceptions" to the first permissible use, which requires exclusive use in foreign trade. Because MarAd referred to the disputed provision as the "Fourth Exception," the court will do so as well.
[14] American President Lines' amicus request that the interpretation of Section 506 be limited to the Puerto Rico trade cannot be granted because the disputed provision, by its own terms, applies to more than just the Puerto Rico trade.
[15] The language in Seatrain actually referred to the Secretary of Commerce rather than the Secretary of Transportation. The 1981 amendment to the Merchant Marine Act substituted the Secretary of Transportation for the Secretary of Commerce. [Pub.Law 97-31].
[16] This party, Matson, is not involved in the present cases.
[17] The court rejects Sea-Land and PRMSA's assertion that the repayment provisions in Section 506 will serve the policies of the Act. Although MarAd does not state any reasons why it rejected this assertion (MarAd only addressed PRMSA's incremental cost argument) it appears that repayment of the appropriate proportion of the CDS will not adequately protect the domestic fleet from unfair competition by the subsidized fleet. In addition to the Supreme Court's "cream skimming" argument, Seatrain, 444 U.S. at 588, 100 S.Ct. at 809, another explanation may be that by receiving the subsidy CDS vessels are able to defer their construction costs over time whereas domestic shippers must pay their entire construction cost up front.